IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:20-MJ-103 |
| | ) | |
| DAVUD SUNGUR, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO RECONSIDER BOND

The United States of America, by and through its attorneys, G. Zachary Terwilliger, United States Attorney for the Eastern District of Virginia, and John C. Blanchard, Assistant United States Attorney, opposes the defendant's Motion to Reconsider Bond. The defendant stands charged with dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). While this charge does not carry a presumption in favor of detention, the United States believes that the defendant, a trafficker of firearms facing near certain conviction of this charge and a forthcoming charge of transferring a machinegun in violation of 18 U.S.C. § 922(o), presents a danger to the community. Because there is no condition or combination of conditions that will reasonably assure the safety of the community, the detention order should stand, and the defendant should remain in custody pending trial in this matter.

### Factual Summary

Until his arrest, the defendant was an active trafficker of firearms in the Eastern District of Virginia. On or about January 2, 2020, undercover Fairfax County Police Department detectives ("UD 1 and UD 2") received information from a confidential source (CS) that the

defendant was selling firearms. That confidential source provided the defendant with UD 1's telephone number, telling the defendant that UD 1 was a prospective firearms buyer. Later that same evening, the defendant contacted UD 1 and set up a firearms transaction for the following day.

On or about January 3, 2020, the defendant met UD 1 and UD 2 at a shopping center in Fairfax County, within the Eastern District of Virginia, and – after donning gloves so as not leave fingerprints on the weapons – showed the detectives two 9mm Polymer80 pistols he had made and pointed out that they lacked serial numbers. The defendant told the detectives he was trying to get bigger in the firearms business and that he had a 3D printer he could use to manufacture a component capable of rendering semi-automatic firearms fully automatic. Prior to leaving, the defendant sold the two 9mm pistols, four magazines, and 200 rounds of 9mm ammunition to the detectives in exchange for $1,600.00.

On or about January 22, 2020, the defendant returned to that same shopping center, where he sold the detectives a Spikes Tactical AR-15 rifle, four magazines, .223 caliber ammunition, and a 3D-printed "Drop In Auto Sear" machinegun-conversion device in exchange for $2,000.00. Before leaving, he showed the detectives a MAC-11 subcompact machine pistol and told them he was working on rendering that firearm capable of firing fully automatically.

When arranging his next deal with the detectives, the defendant told UD 2 he had previously sold Glocks to local customers who are otherwise unable to purchase firearms and to customers in California. The defendant stated that he usually sells Glocks for $900, but he could sell UD 2 a pistol with an extended magazine, a regular magazine, and ammunition for $800 total. He also agreed to sell UD 2 another Drop In Auto Sear for $50. On or about February 19,

2

2020, the defendant met UD 2 at the shopping center and sold him a 9mm pistol, a 9mm magazine, a box of 9mm ammunition, and a Drop In Auto Sear in exchange for $800.00.  During the course of that transaction, the defendant explained how he had made that 9mm pistol and others, explained how a Drop In Auto Sear makes a firearm fully automatic, and told UD 2 what to say if stopped by the police with a pistol devoid of a serial number.  The defendant stated he also had a file on his computer to produce a silencer with his 3D printer.  The defendant also told UD 2 he usually sells firearms as soon as he obtains them, adding that he had once mailed ammunition to a friend in Canada and that he had previously mailed guns to customers in California for a higher profit.  He further advised UD 2 that he was awaiting the arrival of additional Glock-style pistols.

      Finally, on March 18, 2020, the defendant met UD 2 at the shopping center for yet another transaction.  The defendant sold UD 2 six pistols for $2,450.00 and "fronted" UD 2 an additional AK-47-style pistol and an AK-47-style rifle with the understanding that UD 2 would pay him for the latter two firearms later that day or the following day.  None of the six pistols were homemade Glock-style weapons like the pistols the defendant had previously sold to UD 1 and UD 2.  Members of the Fairfax County Police Department's Street Crimes Unit took the defendant into custody at the scene, and shortly thereafter, Homeland Security Investigations executed a search warrant at the defendant's residence.  Agents recovered the aforementioned MAC-11 and a 3D printer from the defendant's bedroom, along with more ammunition.

**Legal Standard**

The defendant seeks review of the Hon. John F. Anderson's detention ruling pursuant to 18 U.S.C. § 3145(b).  The government contends that the defendant should be detained because there are no conditions or combination of conditions that will reasonably assure the safety of any other person and the community.  The government must prove the risk of harm to the community with clear and convincing evidence.  *See* 18 U.S.C. § 3142(f)(2)(B).

**Basis for Detention**

The defendant presents a clear and imminent danger to the community.  The overwhelming evidence developed during this investigation shows that the defendant was a retail distributor of firearms capable of obtaining a variety of weapons in relatively short periods of time.  Additionally, now that the investigation is overt, the defendant knows the identities of the CS who referred him to UD 1 and of the individual who sold him the AK-47-style firearm recovered during the execution of the November 2020 Fairfax County Homicide search warrant, and would pose a danger to these individuals if released.

    **i.**    **Nature and Circumstances of the Offense Charged**

The defendant stands charged with dealing in firearms without a license.  Contrary to the defendant's assertion that law enforcement did not see the defendant as a general risk to the community during the time that detectives continued purchasing firearms from the defendant, *Defendant's Memorandum in Support of Motion to Reconsider Bond* at p. 4, the United States has considered and continues to consider the defendant a threat to the community.

In the case at bar, as in any case, the United States needed to ensure that sufficient probable cause existed to support a criminal charge prior to seeking an arrest.  18 U.S.C.

4

921(a)(1)(A) punishes one who "engages in the business of importing, manufacturing, or dealing firearms . . ." without a license, meaning that the United States needed evidence showing that the defendant was a "person who devote[d] time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms . . ." rather than merely "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  18 U.S.C. §921(a)(21)(C).  The government, therefore, waited until evidence existed that the defendant, a college student with no job and being supported by his parents, had sold UD 1 and UD 2 firearms, magazines, and hundreds of rounds of ammunition on multiple occasions for thousands of dollars and had further incriminated himself by discussing sales of guns and ammunition to others before seeking an arrest.  Moreover, as the majority of the firearms and both of the Drop In Auto Sears that the defendant had sold to the police prior to the final deal at which he was arrested were homemade, the United States sought to confirm via functionality testing conducted in March that the pistols were indeed "firearms" as defined by 18 U.S.C. § 921(a)(3) and that the Drop In Auto Sears actually enabled automatic fire.

    **ii.     Weight of the Evidence**

The volume and quality of evidence against the defendant is overwhelming, consisting of recorded conversations with undercover law enforcement officers, evidence of four hand-to-hand purchases directly from the defendant, seizures of additional firearms and other evidence from his residence, and the recovery of an additional weapon purchased by the defendant from the residence of a juvenile who could not have lawfully purchased the weapon.  Moreover, given

that the Bureau of Alcohol, Tobacco, Firearms & Explosives has (1) corroborated the defendant's statements about the Drop In Auto Sears he sold to detectives rendering semi-automatic firearms fully-automatic, and (2) determined that the Drop In Auto Sears are "machineguns[1]" in and of themselves, the defendant faces near certain conviction of transferring a machinegun in violation of 18 U.S.C. § 922(o).

### iii. Nature and Seriousness of the Danger to any Person or the Community

The defendant made some of the firearms at issue, like the Glock-style Polymer80 pistols that he sold to detectives on January 3, 2020 and February 19, 2020, himself.  As no background check is required to purchase (1) any of the raw components of such firearms or (2) any of the equipment required to assemble such components as fully operable and untraceable "ghost guns," the defendant was and remains able to manufacture such firearms.  While the defendant's 3D printer[2] has been seized, there is no background check required to purchase a new one.

The defendant acquired other firearms at issue, like the AR-15 rifle sold to detectives on January 22, 2020, and the eight guns sold to UD 2 on March 18, 2020, from third parties.  Until July 1, 2020, there remains no requirement to conduct a background check in the private sale of firearms in Virginia, meaning that private sellers can take prospective buyers at their word that they have not suffered any disqualifying convictions and are not under indictment for any disqualifying offenses.

---

1 18 U.S.C. 921(a)(23) adopts, for purposes of 18 U.S.C. § 922(o), the National Firearms Act's definition of machinegun found in 26 U.S.C. § 5845(b), which includes ". . .any part designed and intended solely and exclusively for use in converting a weapon into a machinegun . . ."
2 At the defendant's March 19, 2020 detention hearing, Special Agent Cummings testified that he had been informed by an agent who had examined the defendant's printer at the defendant's residence that the Drop In Auto Sear file appeared to have been accessed recently.  Homeland Security Investigations has since conducted a more thorough examination of the printer.  A Forensic Examination Report of the printer SD's card generated this morning, March 27, 2020, shows that the file appears to have last been accessed on January 2, 2020.

The United States is particularly troubled by the investigative lead that the Virginia Department of Forensic Science ("DFS") provided to Fairfax County homicide detectives following the DFS' analysis of shell casings found at the scene of the November homicide referenced in Section E of the Affidavit in Support of the Criminal Complaint: namely, that the casings were likely expelled by the type of pistol the defendant sold to the undercover detectives on January 3, 2020 and February 19, 2020. While the firearm used in that murder has not been recovered, the AK-47-style weapon that was recovered in the juvenile murder suspect's home had been recently sold to the defendant in a private sale. The government has reason to believe that the defendant sold firearms to a juvenile and continued to deal in weapons for months thereafter.

The defendant is a danger to the community. Though the government has searched the defendant's residence and seized firearms and ammunition therefrom, the defendant could easily gain access to other weapons. Law enforcement is unaware of the whereabouts of the Glock-style pistols that the defendant told UD 2 he would be receiving and wished to send to Turkey during the February 19, 2020 gun deal. Law enforcement has not yet identified any coconspirators, has not yet identified the "friend" whose arrival the defendant was awaiting in the Walmart parking lot on the date he was working on a gun in his car and left a note on a stranger's windshield, and has not yet identified the defendant's other customers.

## Conclusion

The government respectfully requests that this Court issue an order denying the instant motion. The government submits that continued detention of the defendant pending trial in this matter is the only reasonable condition to assure the safety of others.

Respectfully submitted,

G. ZACHARY TERWILLIGER
United States Attorney

By:        /s/
John C. Blanchard
Assistant U.S. Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3999
john.blanchard@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which automatically generated a Notice of Electronic Filing to the counsels of record for the defendant.

                                                            /s/
                                          John C. Blanchard
                                          Assistant U.S. Attorney
                                          Office of the United States Attorney
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          (703) 299-3999
                                          john.blanchard@usdoj.gov